We'll hear argument next in number 1011-5097, Gaylord v. United States, and if we could pause for just a minute to allow everybody to get settled. Good morning, Your Honor. As may it please the Court, in this second appeal in this case on the matter of damages, the plaintiff, Frank Gaylord, put in evidence of approximately $30 million of infringing sales by the government to the tune of $80 million stamps, and of that $30 million, about $5 million was virtually pure profit because it went to collectors who didn't use the stamps and therefore have to deliver letters. There was also evidence of an 8-10% practice by the copyright holder, Mr. Gaylord, his entire life as a professional sculptor. When people wanted to make copies of his works and put them on things like T-shirts, posters, whatever, flat 8-10%, and basically 10%. In this case, that would have meant $2.4 to $3 million recovery as reasonable and entire compensation. The lower court, however, said that $5,000 was the proper amount because it was within the zone of… Are you calculating that based on the total sale of stamps or only the non-used stamps? Total sale, Your Honor. Total sale. It may well not be, but it strikes me that there are really three categories here that may deserve different treatment. One, there's the merchandise, which is, there's a profit on it, it's the kind of thing that typically there would be a royalty relationship between the copyright owner and you can expect that the depiction on the merchandise has something important to do with whether the merchandise gets sold or not. At least, that's the assumption. That's correct. The second category being the used stamps. Now there, it strikes me that the image doesn't really have much of an impact on the sales of stamps that people intend to use. In other words, if I like this picture, I will buy this stamp as opposed to, let's say, the little American flag stamp that's in common usage. But I'm still only going to buy one stamp from the post office and it will be purchased for the same price. So it doesn't really much matter what pictures. I'm not going to say, well, that's a great picture. I'm going to go send a letter. No one would do that. So that's a category which seems to me that the post office is not making an incremental amount of money based on the image. The third category is the retained stamps. And there, don't we have to ask, is there a larger amount of retainage or more stamp collectors collecting this stamp because of its image as opposed to what normally would be the case, where stamp collectors will collect whatever the post office puts out because that's what they do. Could you address the question of whether those three categories should be treated separately? I think it's valid to look at them separately. And I think with respect, let me start with the retained stamps because that is really where the profit to the government is. There wasn't testimony that there was more retained stamps in this case than in other cases of stamps. But what there was was testimony by Mr. Delaney that they sold 20 to 30 million more stamps than the average commemorative. So there was a big jump from 50 to 60 million to 80 million. Okay, what caused the jump? Well, obviously we can't prove with beyond a reasonable doubt what caused the jump. But we also know that according to the records of the Postal Service, only 14 million, which is a lot, were retained. So 20 to 30 million more than the average, but only 14 million were retained. So you have 16 million more stamps sold to people who are actually using them. Mr. Fahler was quoted and he adopted this testimony. A post office head of stamp design said that the attractiveness of a stamp helps people buy them. So you could go into the post office and you could buy their run-of-the-mill forever stamp. It just has some image on it maybe. But you see this Korean War stamp, you might just like that. It's a nifty thing to put on a letter. Right, but every one of those, if I'm using the stamps, every one of the Korean War stamps I pick means one less of the generic stamp that I buy. Correct. As far as the post office is concerned, it's a wash, right? That's a good point, but the purpose of commemorative stamps is to drive the retained amount. That's really what we ought to focus on, right? Yes, okay. The number of used stamps is almost irrelevant. But on the other hand, I don't think, and I think in a negotiation, I think even if the trial court wanted to reconsider this, I don't think it would be beyond the realm of reason to say one royalty for the stamps that are used and a different royalty for the ones retained. I think that would be reasonably related to the profit driven by the one set. But I don't think you give them a free ride on the others. And also, Your Honor, there's $5 million of profit. Presumably some of that was because of this image. If you sell $20 to $30 million more total, it's hard to believe that you don't sell more retained than you would have. Isn't there a chart on page A1233 that gives the exact percent of stamps bought that were retained and breaks it down by various stamps? Is this the exact evidence that you're speculating about? Or am I misunderstanding? The table suggests that 11.5% of all Korean War vet memorial stamps were retained, i.e., presumably by collectors or people who accidentally lost them, one or the other. So doesn't this actually show in table format how much collectors preferred to retain this stamp versus how much – obviously Arctic Tundra is something special because look at that, far more collections there. So doesn't this table actually depict exactly what we've just briefly been discussing for the last several minutes? It does in part, but it doesn't tell the total picture, Your Honor. What this chart shows is that for those particular six commemorative stamps that were issued in that quarter, the retention rate for the Korean War Veterans Memorial was at the average. The average works out if you do the numbers 12% and they were at 11.5%. So it was right there. It wasn't higher than those six and it wasn't lower. But if Your Honor looks at some of the things that the government relied on and looks at them fairly, you'll see that in fact this stamp has shown above all of them except Audrey Hepburn. Who can touch Audrey Hepburn? But A1231. Which 1231? 1231. And this is the number of stamps retained. Now that looks like the Korean War Veterans Memorial with 14 million is right at the bottom. And the government kind of relied on that. Oh well see, look, it's at the bottom. But there were design sets sold of the others. The Southeastern... I'm sorry. The reason is that of course it being at the bottom doesn't answer the question that we've been trying to get at because this is in terms of the number of stamps retained and maybe there were only 14.5 million made and every one of them was... Well we know there were 86 million made. But that's why the chart on 1233 seems to exactly answer the question because it tells you what percentage of the stamps were retained by collectors and doesn't that therefore give you a very clear picture of how much collectors valued this image versus other images in terms of collecting. But you're leaving out the total stamps sold, the 80 million versus however... But the rest of them were used on letters and they were used and as... No, I was talking about comparing to the numbers retained by the others. These are sold in sets. What does that mean? If you take a look at the 26.2 million stamps sold, they're sold in a set of five stamps. So you get five times 37 cents and they all come as a unit. So if you divide and normalize this by actual sets sold, okay, we sell one stamp, they sell five. If you look at the Arctic Tundra, they sell a set of ten. Mary Cassatt, a set of four. Early Football Heroes, a set of four. If you normalize it by the sets sold, Audrey Hepburn is number one at 23.7. Where is this image that you're referring to? Okay, take a look, Your Honors, at 12.68. You'll see what I'm talking about. Okay. You see the Southeastern Lighthouse at the upper right-hand corner is sold as a set of five stamps, each for 37 cents. Each stamp for 37 cents? Yes. Not each set for 37 cents? That's right, each stamp. If you look at the ones at the lower level, Mary Cassatt, four at 37 cents each. You can see the 37 on Early Football Heroes on the right, so they're getting four times 37, but they sell it as a unit. Arctic Tundra looks like one, but it's actually ten. They sell ten stamps that together are like a jigsaw puzzle. They create a big image, and that's the niftiness of Arctic Tundra. So you're getting ten times 37 cents. So if you normalize it, to be fair, by a unit sold, Korean War is right behind Audrey Hepburn, and the rest of the four are distant behind those two. Was this in your brief? Was this argued below? I just don't remember this, and I feel like it's a creative argument, but I just don't know where it's coming from. Okay, well, if Your Honor would look at it, the government made a... It was a straightforward question. Was this argued below? It was argued by the government. Misleadingly, we didn't respond to it in our reply brief. But the government said, if you look at their brief, they said, well, here's what they did. They quoted what the survey said and didn't explain this point I'm making. If you look at page 1216, they quoted the next-to-last bullet point on 1216. Well, maybe your argument would be there. It would have been fruitless for you to have argued it below because the court based its decision entirely on the 1500... Oh, I thought you meant in this court, Your Honor. Well, yeah, I don't see it in this court either, but... We didn't, but I'm saying in this court they told you, they quoted that as if to say, you know, we were at the bottom. We're not at the bottom if you're fair and normalize it by the number of stamps sold as a unit. Well, this may all be in the realm of speculation and the need for factual finding. I can see that... Right, we're not asking you to find it. Well, I understand, but when I say this, I mean what I'm about to say, not referring to Judge Moore's questions. But it does seem to me odd that the value that we're attaching to the copyright depends so much on what particular denomination of stamp the Postal Service decides to put the image on. When we're talking about retained stamps, again, my understanding is stamp collectors, particularly the avid ones, will buy collections of any stamp that's put out. So if you put the image on a $2 stamp, you're going to have, you know, six times as much revenue from the retainage, and yet the image isn't really any more valuable to the Postal Service. It's not generating any more sales. Now, there appears to be a discrepancy in the sales of some stamps over others, the Audrey Hepburns and the Mary Cassatts or whatever, but it's not clear to me, since you're not at the very top of that, it's not clear to me how that should affect the inquiry into the amount of royalty. Presumably, based on the Postal Service's experience, $5,000 is... Five million, yeah. $5,000 is the amount that is sort of the top of the line for royalty. So if you had a picture, you know, a drawing of Audrey Hepburn that somebody had done, they would pay $5,000 for that. Not comparable, Your Honor. None of those are comparable, because... And I would recommend, if you haven't done this, go over and see the memorial, because the issue here... I think it's a splendid memorial, but... But the issue is the photo versus the memorial. Well, I understand, but why isn't the Audrey Hepburn drawing comparable? Because the work... If the government were going to get... And we don't know what they... Okay, supposedly they paid $5,000 to get the Audrey Hepburn, if they're saying that. But if they went to Gaylord and said, we'd like to commission you to build the sculpture, they would have had to pay him at least $775,000 just to build it without the copyrights. The copyrights, they would have had to pay extra. So you can't compare commissioning a sculpture with commissioning a drawing or taking a pre-existing painting or drawing, unless it's a Picasso. You can't do it. And that's what I'm saying is the reasonableness of the zone of reasonableness depends on the starting point, and the starting point was the $1,500 paid to John Ali for his photo by the Postal Service. That is not comparable, because that is number one for a photo, not for the underlying work. He took a photo over a couple of days in a snowstorm, and that's what they got. He told them, though, I can't give you the rights to what's down there on the mall. You've got to go see the owner of that. And they never did. At least they never approached our client, Mr. Gaylord. So you can't compare, in effect, an infringement, because what Ali offered that photo, he was disseminating an infringement, whereas in this case, you had the underlying work, and this underlying work was sold for 10%. Okay. Why don't we hear from the government, and we'll restore a couple of minutes of your time for rebuttal. Thank you. My question. Thank you. May it please the Court. The primary issue here on appeal is whether the trial court correctly awarded a lump sum royalty in the form of a lost license fee of $5,000 to Mr. Gaylord. The trial court supported its award with objective and comparable evidence, and its methodology is reviewed for abuse of discretion, and the amount awarded for damages is reviewed for clear error. Despite all this, Gaylord asked this court to reverse the trial court's correct decision to throw out the objective and comparable evidence and to manufacture a support for a running loyalty of $3 million. If the lower court used the wrong legal framework to come up with damages, then that would be abuse of discretion, right? We have to look de novo at the legal principles that the court chose to apply. That's correct, Your Honor, but that's not the case in this particular situation. I understand Mr. Gaylord's claim. On appeal, it's that the court used the wrong legal principle because it seemed to narrowly limit itself to a focus on what the post office had traditionally paid for prior photographs that became stamped. As a matter of law, that's not the correct way to come up with a calculation for damages. That is Gaylord's claim, Your Honor, but that's not at all... That sounds like a legal claim to me. That is what Gaylord is claiming, but in this particular case, if you look at the trial court's opinion, the trial court actually constructed a willing buyer-willing seller hypothetical negotiation, and that is perfectly correct from a legal standpoint, and it informed this hypothetical negotiation with the objective comparable evidence. Where does the trial court, and maybe you can explain it to me, you don't have to point me to the right page, but what factors does the trial court analyze vis-à-vis what Mr. Gaylord would have been willing to license these rights for? Because the only thing I really see is an analysis of what the postal service would have arguably been willing to pay based on past history, but I see very little analysis, and maybe not any on Mr. Gaylord's position as the hypothetical copyright holder in this license. That's what I'm trying to ask you, if you could fill me in on what you think they did. Yeah, I mean, the trial court's analysis was somewhat abbreviated. They do say that, and this is on page A5 of the appendix, that plaintiff's efforts to show that a royalty rate should apply are not credible, and of course the word credible is a touchstone for the trial court's fact-finding mission. But I'm asking you about the legal standard, which is the main basis of their appeals, I understand it. So where does the trial court do some analysis of what Mr. Gaylord, as the hypothetical licensor, would have demanded? Well, again, on page A5, the court says, even if a royalty rate approach were permissible in limited circumstances, and this is like Gaylord's argument. But doesn't that make you stop and think that as a matter of law, the trial court is concluding that a reasonable royalty type approach is not permissible as a matter of law? No, Your Honor. If you look at the trial court's preceding paragraph, that seems to be where the trial court says, in my opinion, it's not permissible as a matter of law. And if that paragraph had just been in complete isolation, that would be error. But the court goes on to say, but even if Mr. Gaylord's argument is correct, and it's actually the same argument as the government's. The government has always said that in certain circumstances you can get a lost license fee in the form of a royalty. And the court acknowledges that. The court says, even if that is the case, the court concludes that a $3 million royalty payment is not within the zone of reasonableness. I mean, I'll give you one last chance, then I'll let you move on for just accepting the fact that you're not actually going to answer my question. Where does the court analyze what Mr. Gaylord... You acknowledge that the test is willing licensor, willing licensee. I see the analysis of what the post office would have been willing to do. I see no analysis of what Mr. Gaylord would have been willing to do. And that's what troubles me. And maybe it's just not there, and I should just presume that the court did it. Maybe that's your answer, but... No, I mean, the record is full of the licenses that Mr. Gaylord cited to support what he would have supposedly been willing to do. I mean, he's always argued that he wanted a 10% royalty. And in fact, if you look at the government's brief on page 39, what we've tried to do is we've tried to identify the different licenses that are in the record, and we've argued that none of those licenses are comparable. The trial court seems to have bought that argument and said that his efforts are not credible at all. What does that mean, not credible? It means that the licenses that were put forth are not comparable to the infringement at all. Of the four licenses that Mr. Gaylord submitted, two of them had absolutely no sales. One of them was done after this suit had been filed, and in fact the parties bargained on the outcome of this suit. That was the license with John Ali. And all of the licenses dealt with retail goods. Now, as Your Honor was... What do you do with the retail goods in this case? Because that seems to me to be the strongest component of his claim. That's correct, Your Honor. Now, we've always stated that in order to recover any income or any license or royalty from a particular revenue stream, you have to show two things. You have to show some sort of causal connection and you have to show objective comparable evidence. Our argument is that he hasn't done that with respect to any of those three different categories of damages you mentioned previously. But I assume his argument in response to that would be how can you not look at the fact that you all sub-licensed his image for 8%? That's completely consistent with his argument that the 8% to 10% royalty rate is the appropriate rate, and that's exactly what you all licensed it for. Right. We didn't necessarily license his image. We licensed the stamp with his image on it. And I think it's good for the court to pay attention that once an image becomes a stamp, it immediately becomes more collectible and marketable, but not necessarily as a result of the underlying image, but because it's a unique good. It's a postal service stamp. It's a one-of-a-kind item that's used as a prepaid voucher for stamp services. Surely the image on the stamp has an effect when you're talking at least about merchandise like this. I dare say that a tote bag with a picture of a stamp containing a depiction of the Enbank Federal Circuit would not have $160,000 worth of sales. That's correct, but there probably still would be people who collect it. I can think of 12, but I'm not sure. But these collectors are collecting these things for any number of reasons. This is exactly like the Mackey v. Reiser case where you can think of any number of reasons why somebody might collect something. Perhaps they like the subject matter. For example, we had witnesses testify at trial that Elvis was one of the most popular stamps ever, or as the witness said, Elvis is still the king. But I suspect a large portion of that was due to the subject matter. Now there may be some people who are out there collecting because of the artistic qualities of the image on a stamp, but that's the plaintiff's burden to show that. They can't just speculate, especially on appeal, about that. They presented these arguments to the trial court, and the trial court found all the arguments not credible. I don't see where the trial court actually made a finding of credibility on these arguments in terms of anything specific, but I'm looking on page A463. You don't have to get it. It's not critical. But many of the products that were sold are postcards, magnets, lapel pins. I can't imagine the little white crinkly edges made such a big difference in the sale that he's not entitled to a percentage in the same way as merchandise sales that were otherwise made. I mean, that's the only difference, the little white crinkly. That's the only thing that flips off the bat. Your Honor, I disagree because I think it's a stamp. Wow, I really like that white crinkly edge. It's more than a crinkly edge. It's an indication that this is a one-of-a-kind image. On postcards, magnets? Yes, I mean, Mr. Gaylord had tried to sell these types of retail goods previously and had never been able to do it, and so there may be, I mean, we're in the land of speculation now. We don't know exactly why people are buying these things, and it was frankly plain as burden to show. But let's also be clear about something else. This amount relating to retail goods amounts to approximately 1% of Gaylord's claim. It's $330,000. I'm sorry. Please, go ahead. It amounts to four times what he got in recovery. It's $17,831.93, and that's at 8%. If he got 10%, it would have been... Right. Actually, he never made a claim for that particular licensed pool of money. That was the 8% royalty that the Postal Service obtained by selling the postcards he changed. That's not in his damages calculation. In his damages calculation is another set of retail goods where the Postal Service directly... The 8% was to third parties, where the third parties would go out and present images of the stamp. The other retail goods that the Postal Service... If he was licensing third parties to sell T-shirts and things like that with an image of his sculpture, then the Postal Service stood in his shoes and did that exact same thing and raised almost $18,000 in profit from it. At most, that would be the but-for portion of the test, but it wouldn't extend to the other $330,000 in retail goods that Gaylord claims as a component for his damages. Certainly, neither part of the test applies to the $30 million in stamp revenues that Mr. Gaylord... I think that it's a good point that you just raised. Judge Bryson set out three different categories which he thought arguably could or should receive differing treatment. Do you agree with that? Certainly, you're making an argument that even if you were going to go this way on this portion of goods, Your Honor, you've got to look differently at the stamp. The problem is that Mr. Gaylord's claims for damages at the trial court never broke down these categories or this amount into separate categories. It was always a lump sum. I want 10% of all the revenues essentially, and no claim at all was made as far as the $5.4 million in retained stamps. We can only... All that evidence was before the trial court, and the trial court simply didn't find it credible at all. In fact, once... Well, the trial court used the word credible, which really had no basis here. It meant a throwaway line. He made the decision it was going to be $5,000 or nothing, and that was it. It wasn't $5,000 or nothing, Your Honor. He looked at what he considered to be the objective comparable evidence, which was the testimony of John Ali as to his actual transaction with the Postal Service, whereby the Postal Service agreed to pay him $1,500 to license the image that was actually used for the stamp. Then the trial court also paid attention to and believed the testimony of the Postal Service's manager of stamp development, who testified as to the licensing practices between the Postal Service and artists, and at times it ranged between $2,000 and $3,000, and at a maximum it was $5,000. What about the Calvin and Hobbs stamp? What did they get? There was a huge litigation over that. There was a big deal in the press years ago, and in fact I remember expressly that the Postal Service was not entitled to sell merchandise. I know this is outside the records. I recognize this, but it just comes to mind because I remember it. Honestly, Your Honor, I don't have any idea. It didn't come up at all, but this particular witness had been the manager of stamp development since 2000, and he testified that he handled all the different stamps that came through, and his testimony was that $5,000 was the maximum that artists would agree in negotiations to receive from the Postal Service for the right to use their image on a stamp. Mr. Portelli argued that that's different. That's for someone to go take a photograph of something, i.e. what Mr. Ali might have been entitled to obtain from the Postal Service in terms of tradition in the Postal Service. That is the reference point for the photographer, but not the reference point for the creator of the underlying work, like Snoopy, like Calvin and Hobbs, like these sorts, like Mr. Gaylord's statue. So should this $1,500 to $5,000 necessarily balance what the Postal Service should pay to someone Mr. Gaylord's shoes? Yes, Your Honor. In fact, if you look at the witness's testimony on page A1834, what the witness said is that for pre-existing photographs, they usually pay a little bit less, somewhere in the range of $2,000 to $3,000, because the owner retains the right to go ahead out and make their own sales and exploit it. Yes, that's page A1834, and specifically page 587 of the transcript. Now, on the other hand, with respect to commissioned work, such as illustrations and photographs that were not pre-existing, in those particular cases, then the artist was typically awarded towards the top of the compensation, which was still $5,000. The trial court took notice of all this, and basically used this term of art called zone of reasonableness, which is the range of damages that can be supported by the evidence. You say it's a term of art, yet I found it only in one case from the 1980s, written by an esteemed colleague of mine when he happened to have been a claims court judge, and I don't see that it's really a term of art in terms of it's received universal praise and acceptance. And even in that case, I didn't really see it as a test, but more like a sort of discussion of what he was noticing about the fact. I guess perhaps the term of art was a little strong, Your Honor. I meant perhaps only with respect to the Court of Federal Complaints cases dealing with 1498B damages, of which this is only the second one. But there have been other cases, such as the Jarvis v. K2 case, which involved a range of compensation, and then the trial court has awarded an amount within the range. Also, the Mackey v. Reiser case, if you look at the trial court's decision, was the same way. I see that I'm over my time, if there are any more questions. Thank you, Your Honor. Let's hear from Commissioner Porcelli. Is it Porcelli? It's Porcelli, Your Honor. I said Shaw used to call me Porcelli, and I never corrected him. I asked you Porcelli, not a yes. Oh, I did? Oh, I thought you said Porcelli. I think I said it wrong, and it's not a yes. I was very polite of you, but you'll correct me when I'm wrong. I'm sure you will. Well, I didn't judge Shaw, but whatever. The problem with the starting point of the Alley photo for the zone of reasonableness is you heard the testimony repeated by my brother that the amount the post office has paid for a pre-existing image was no more than $5,000. But the Alley photo wasn't a legally pre-existing image. The Alley photo was an infringement. He had no right to sell that at all. So how can you take... There was no pre-existing image that was legally available to the post office. They had to go to Gaylord and say, Can we make a photograph of this sculpture and put it on a stamp? So you cannot compare, as Your Honor rightfully noted, $1,500 for a photo with $770 just to build this statue and the commissioning of a sculpture. So it's entirely different. Now, what we want, Your Honor, is a rational economic analysis with findings by the lower court. We want a remand. Now, my brother did a very able job of attempting to evade the real issue, which is there was no findings of fact by the lower court about what Mr. Gaylord would have done, only what the government would have done. Just out of curiosity, the record below seems a bit sparse from which to reach possibly the kind of damages calculation that you're looking for. But as I understand it, when the trial court decided this issue, both parties agreed no further factual development was necessary. Is that the position that you still hold? If we were to remand under a new test or under what we think is a correct test but that wasn't properly applied, is that something that you think would be necessary or possibly necessary? It would depend on what Your Honor has ruled was the remand test. And if the remand test is what we think it is, we would like to, you know, potentially... No, we would not. We don't want any more evidence. If the remand test is what we want. And let me say this. Your Honor has skepticism about the popularity of this stand. Let me add one fact that's critical, and I'm off over time, but if I may just say this. There's another key fact of the value of this stamp to the government. And this is probably the best fact in the case. Not the numbers, not the dollars. They had the opportunity to commemorate the Korean War with thousands of free photos that the Army had of the Korean War. Why did they go ahead with my client's sculpture? They had to have... Let's assume this because they thought, and it would be a rational conclusion, that they thought that was the best depiction available. And that's your best case scenario. The question, though, is what is it since... What's the tipping point for them? They would perhaps be willing to offer $5,000. Maybe they'd decide to double the maximum that they've ever offered because they really did want that photo, $10,000. But that's not to say that they would have said, you know what, we want that photo so much that we'll give the sculptor $3 million for it. That is... That's your argument, in a sense, is what you're pressing on us. And that seems out of line with their normal course. You would have said they're going to walk away a long time before they get the $3 million, I would think. Whether they would have walked away, the point is they didn't, and now we are in a situation where they went ahead. They shouldn't be rewarded for their failure to pursue negotiations. That's for sure. But they also shouldn't be punished to the extent of saying that we're going to take you all the way from $5,000 to $3 million because you didn't get the copyright. But, Your Honor, if we borrow a little bit... We're not asking the wholesaling graph to pack along to this. We're not. But there are some principles that do apply, and one of them is the Unilock principle that licenses have to be comparable. Even the government agrees with that. And they say all our licenses are not comparable and all theirs are. I submit to you, Your Honor, that the $5,000 highest amount paid is for pre-existing images or to commission a painting or a drawing. It's not to commission a sculptor. It's not comparable. The copyrighted work is what's down on the mall, and the $5,000 that they have a policy of paying is to negotiate either an artist to make something, paint something, or to buy a pre-existing sketch. It isn't comparable. You have to look at what the work is. And the only relevant evidence in this case that's comparable is the Gaylord licenses. Now, they attempted to demean them by saying 16th, no money. Well, the World Travel License got $16,000. I'm really having trouble with the notion that the amount of a license ought to be determined. The license of a depiction of something ought to be measured by the value of the underlying object that's being depicted. I mean, suppose the Postal Service decided to depict a Boeing 787 to show the American aviation on the rise. And Boeing has rights in the design of the 787. I don't think that the 787's copyright value would depend on how much the plane cost, would it? The reason we mention that and the relevance of it is it makes incomparable the data put in by the government about what they would pay to get a photo. Because that's not what we're talking about. That's all. That's why it's not comparable. OK. Very well. Well, thank you, Mr. Forsythe. Thank you. And we thank both counsels. The case is submitted.